### HARDY *v.* TRICK.

1. CONSPIRACY TO DEFRAUD—ATTORNEY AND CLIENT—EVIDENCE.
   Evidence that an attorney induced his client, a widow, wholly unacquainted with land transactions, to loan money to his office associate upon property which he knew to be mortgaged to his (the attorney's) mother in a large amount, representing to the lender that he would obtain for her, as security, a deed of the property, which would be "better than a first mortgage," and that, after procuring the execution back of a land contract giving the borrower possession of the premises, he instituted proceedings for the foreclosure of the prior incumbrance, and bid in the property for his mother, thereby depriving the client of her security,—is sufficient to sustain a finding that the attorney was associated with the borrower in a conspiracy to defraud.

2. SAME—PLEADING AND PROOF—VARIANCE.
   An allegation in the pleadings that an attorney conspired with a proposed borrower to induce a client to loan certain money by falsely representing that he would procure for her, as security, a deed of property "free from incumbrance," is substantially supported by evidence that his representations to the client, who was entirely ignorant of legal transactions, were calculated and designed to persuade her that the deed as security would give a clear title, superior to any existing mortgages.

Error to Wayne; Hosmer, J.    Submitted May 10, 1899. Decided September 19, 1899.

Case by Mary B. Hardy against William Trick and John H. Powell for conspiracy to defraud. From a judgment for plaintiff, defendants bring error. Affirmed.

*John H. Powell* and *Thomas Hislop*, for appellants.

*Finn & Hockaday*, for appellee.

LONG, J. The defendants were charged with fraud and conspiracy in obtaining certain moneys from the plaintiff. Defendants were arrested and held to bail on a *capias*. On the trial of the case it appeared that William Trick was a contractor and builder. The defendant Powell is an attorney-at-law. All the parties reside in the city of Detroit. Prior to the time the transactions occurred which led to the present controversy, Powell had done more or less legal business for the plaintiff. Her husband had died, and she had received $1,800 for a dower interest in some lands. She also had a homestead in Detroit, upon which there was a mortgage of $1,400. The mortgage would become due in about six months from June 1, 1893, and part of the $1,800 had been put, under defendant Powell's suggestion, into McLellan & Anderson's Savings Bank, at 4 per cent. interest, to await the time when it could be used in the payment of the mortgage on the homestead. Plaintiff claims that on May 26, 1893, defendant Powell sent for her to come to his office in the Moffat Block, the same office being, and for some time had been, occupied by defendant Trick, who frequently consulted Powell about his business affairs. Apparently Powell was familiar with Trick's affairs, and to some extent with the incumbrances on his property. Plaintiff testified that, when she went to Powell's office on that occasion, he told her that Trick wanted to borrow $600, and that he would pay it back in six months, in time to pay the mortgage on her homestead, and said, "You are just as sure of it as the wheat." She was asked by her counsel about the security that was then talked of, and testified:

"Mr. Powell said there was an incumbrance on it. Well, I said I disliked to make a loan, not knowing anything about business matters, except it be a first mortgage. I said I had often heard my husband say that you can make a loan on a first mortgage all right. And he says, 'There is no first mortgage about it.' He says, 'You shall have a clear deed and title of the property, and I will look up the records, and see that you get it;' knowing that I had confidence in him to transact the business. And he says, 'It is better than a first mortgage.' I says, 'Is it as good as a first mortgage?' 'Why,' he says, 'there is no mortgage about it.  *  *  *  You get a clear deed and title to the property, and you are very foolish not to make the loan.'  *  *  *  There was an unfinished house on the property, and he was to go on and finish the house with a part of this money, so that it would be rentable."

The arrangement was finally made, and the $600 paid over, with the agreement that plaintiff should have 7 per cent. interest, and a bonus of $30. The plaintiff testified, as to the security, that all that was given her was a land contract, which she and Trick each signed, but that she never knew of any deed being made; that, at the time the loan was made, Powell told her to come in a few days, and get the papers and the deed, as she says she supposed; that, when she called in, Powell said he could not find it, and told her to call again; that, when she went the second time, she asked if the deed was ready for her, and Powell told her that Annie Corbett (his mother-in-law) held the deed. Plaintiff then testified:

"'Why,' I says, 'that is strange. You told me that I was to have a clear deed and title.' 'Well,' he says, 'she comes first.' And then it began to dawn on me that there was something wrong. 'Well,' I said, 'I don't see,—I can't understand it,—when I was to be the first, and you told me that I was to have this clear deed and title, and that I was sure of the money.'"

Plaintiff testified, further, that she had been told by Powell that there was a $1,200 mortgage on the property, but that she was to have a clear deed and title, and that would be better than a first mortgage. It appears, how-

ever, that at that time, and as a part of the same transaction, the defendants drew up a deed, which was signed by Trick and his wife, and acknowledged before Powell as notary public, and witnessed by him, conveying lot 22, block 14, of Campau's subdivision, etc., in the city of Detroit, to the plaintiff, the consideration being stated in the deed as $3,000, subject to a mortgage of $1,250, given by first parties to one Annie Corbett. On the same day a land contract was drawn up by the parties, which was signed by plaintiff and Trick, by which the plaintiff, as party of the first part, agreed to convey the premises mentioned in the deed as above to Trick—

"For the sum of $3,000, which the said party of the second part hereby agrees to pay to the said party of the first part as follows: $1,120 on the delivery of this agreement, and $630 on or before six months from date hereof, with interest at the rate of seven per cent. per annum, payable semi-annually. Said second party also agrees to assume and pay a mortgage of $1,250, held by Annie Corbett, with interest on all sums at any time unpaid hereon at the rate of seven per cent. per annum, payable semi-annually."

The contract gave Trick the possession of the premises, but provided, as is usual in such contracts, for repossession by the first party. This was the security which Powell obtained for the plaintiff for the $600 loaned by her. Some time after this contract was made, Powell commenced foreclosure proceedings for the foreclosure of the Annie Corbett mortgage, and in August, 1894, he bid in the property for her at $1,414.24, that being the highest bid. The deed was made to Mrs. Corbett, and she now owns the property.

About four days after the above transaction, and on June 1, 1893, Powell induced the plaintiff to loan Trick another $600, and it is claimed that about the same representations were made to her to obtain it on another lot, Trick making to her the same form of deed as the former one. This property was incumbered with a mortgage to the People's Savings Bank of $1,200. The deed

was made subject to this mortgage. The land contract which was executed by the plaintiff back to Trick recited that he was to pay for it $3,000, as follows: $1,170 at the execution of the contract, to assume the mortgage of $1,200 against the property, and pay $630 on or before six months, with interest at 7 per cent. There was another mortgage, also, on this property at that time, which the plaintiff claims she was not informed of. It was given by Trick to Rollin Amsden for $293. The Amsden mortgage was thereafter foreclosed, and the property bid in by Amsden for $1,649.65, which about equaled the two mortgages, with interest thereon. Amsden has since acquired title to this property.

Defendant Powell was called as a witness in his own behalf, and on examination was asked:

"Whose idea was this in making this deed out and the contract back, instead of a mortgage, to secure the loan?
"*A.* That was my suggestion, I suppose.  *  *  *"

On cross-examination he was asked:

"Now, in case Mr. Trick failed to pay this [the money to plaintiff], how was she to take care of the $1,250 that was due your mother-in-law?
"*A.* I don't know anything about that.
"*Q.* Didn't you think about the question, How will this woman take care of these things if Mr. Trick fails?
"*A.* I don't know that her relationship to me was so very close as that.
"*Q.* You had been her lawyer ever since her husband died, hadn't you?
"*A.* I don't know as I would put it in that way. We had not had such close relations.
"*Q.* You had closed up the estate?
"*A.* I had done what was necessary here in this court.
*  *  *
"*Q.* Didn't you actually have some of this very money that you let Mr. Trick have—that Trick borrowed—in your hands at the time the negotiations were going on?
"*A.* I may have had; I don't think I had."

Powell admitted that he had in his hands $600 of the $1,200 loaned to Trick; that he had it out of the estate of

Mr. Hardy. He also testified that plaintiff might have relied upon him to see that she got the proper title or security on the lots; that he considered the piece of property upon which the first loan was made to be worth from $1,850 to $1,900; and that it had a mortgage on it, running to his mother-in-law, of $1,250.

Mr. Trick was called as a witness, and testified, in relation to the last deal, that he had lost the title to the property when he gave plaintiff the deed; that he had no property, at the time he received the money from her, that was unincumbered. He was asked:

"Who represented to you it was better to give a deed, or, if you were borrowing money on a second mortgage, why did you give a deed?

"A. That is the way Mr. Powell chose to do it.

" Q. The arrangement between you and him was made that you should take the money before he—

"A. No, sir; he offered me— He telephoned me, and asked me if I could take it. I didn't know anything at all; neither had I instructed him to get the money for me at that time.  *   *   *

" Q. According to this contract that you signed and had the woman take, it is put there that you had paid her $1,120 on the delivery of this agreement. Now, did you pay her a cent?

"A. No, sir.

" Q. Why was it put in that contract that you had paid her $1,120 on this contract?

"A. I cannot explain it.

" Q. Do you know how you got at that $1,120?

"A. No, sir, I do not.

" Q. That was all left to Mr. Powell, was it?

"A. Yes, sir.

" Q. This whole planning of making the paper with that kind of thing was left to Mr. Powell?

"A. Exactly.

" Q. The fact is, you did not pay the woman any money?

"A. I paid her $7 on lot 5.

" Q. Now, the other contract that she recites,—that you were buying the property for $3,000,—there was no such agreement, was there?

"A. No, sir.

" *Q.* And it recites that you have paid on that $1,170?

"*A.* Yes, sir.

"*Q.* You hadn't done that, had you? You didn't pay anything on that to her, either?

"*A.* No, sir.

" *Q.* Then that contract is not right?

"*A.* ·That is so.

" *Q.* There was an unfinished house, wasn't there, in one of the transactions in connection with Mrs. Hardy?

"*A.* Yes, sir.

" *Q.* Did you finish that house?

"*A.* No, sir.

"*Q.* Wasn't this money given to finish that house with?

"*A.* No, sir.

" *Q.* Was there an understanding with Mrs. Hardy that she should let her money go, and that the house on the property should remain unfinished?

"*A.* I don't think so.

" *Q.* You think she understood that it was to be finished, didn't she?

"*A.* Well, I had no conversation with her on that. I simply infer she would think that.

" *Q.* Didn't you tell Mr. Powell that you were going to finish it?

"*A.* Yes, sir.·

" *Q.* Did you use the money that you got from Mrs. Hardy to finish the house on the corner of Twenty-Seventh and Hudson?

"*A.* No, sir.

" *Q.* Then you didn't use any of the money to complete the building that was on the lot that you were turning out to her as security?

"*A.* No, sir.

" *Q.* Did you ever complete it?

"*A.* No, sir.

" *Q.* Let it go without any more attempt at completion?

"*A.* That is so."

The cause was tried before a jury, who returned a verdict in favor of the plaintiff for the full amount of her claim. Defendants bring error.

It is contended in the brief of counsel for defendants that the testimony of the plaintiff herself disposes of the question of conspiracy to defraud her of her money. We

121 MICH.—17.

cannot agree with this contention. Under her testimony it became a question of fact for the jury to determine, and the question was fully and fairly submitted to them.

It is also contended that there was a variance between the pleadings and the proof; that, while the affidavit for the *capias* and the declaration charged that the property she received as security was to be free from all incumbrances, the testimony of the plaintiff shows that she knew of the incumbrances, and took the property as security with full knowledge of the incumbrances. This cannot be said of the plaintiff's testimony. Her testimony is that the deed was to be given to her as security, and it was to be a clear deed and title to the property, and that Powell assured her the deed was better than a first mortgage; that, if she took the deed, there was no mortgage about it, and she got a clear deed and title to the property, and that she was foolish if she did not make the loan. It is evident that the plaintiff was wholly unacquainted with land transactions, and believed that she was getting a title that was better than a first mortgage. There was no such variance as claimed between the pleadings and the proof.

It is also claimed that the court was in error in excluding a list of Trick's property. The defendants could not have been prejudiced by this, as Trick, in his examination as a witness upon the stand, testified that he had no property but what was mortgaged.

Many other errors are claimed, all of which have been examined with care, and we find no error.

The judgment must be affirmed.

The other Justices concurred.